The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. Proceeding next in the case of the United States v. Mark Cowden. Mr. Sheehan. Yes, Your Honor. Thank you. Good morning. I'm going to start in the last place on my, almost the last place on my brief. I want to talk about the verdict form in this particular case. Verdict form is composed of interrogatories and not a plain guilty or not guilty verdict. I believe that to be structural error. I've cited a number of cases for that. I believe that at a minimum, the case needs to be reversed because there was no general verdict. The primary issue, however, in this case really is whether this is a case here at all. I have been doing criminal work for a long time. And I've been doing enough appellate work that I know how this works. You've read the briefs. I know, I'm assuming you have not watched the videotapes. Videotapes in this case are the whole case. I'm going to encourage you to do that. They are very, very brief. They're about three minutes in total. What occurs in this case is that Mr. Hamrick decides to flee instead of stopping for DUI, tends to fight it out with a state trooper. It's a long and bloody battle, and finally he is conquered and brought in. The trooper's activity during this episode, he's patrolling alone, he's calling for backup. They wear radios on their shoulder. At some point he's asked, do you still need help? And mid-fight he touches his shoulder and says, just get here. But the issue was back at the station house. It's subsequent. I will get there. I promise I'll get there, Judge. The reason I do mention this, though, is that this sets a stage for what people are expecting when the person comes into custody, when you finally have something. Instead of now waiting patiently, I hope our guy's going to be okay, I hope something's going to happen. We're keyed up to come to his aid, but we've been prevented from time and distance from being there right now. So there is a sense when Mr. Hamrick finally arrives at the station that we're going to have to express firmness to him so he knows he's in custody, so that he's in a place where there's not going to be any further problem. Meanwhile, the police officers and, in fact, Lieutenant McCadden, who's in charge this particular evening at the Sheriff's Office, arranges for ambulances to be there, both for potentially for Mr. Hamrick and also for Deputy Hodor. Both of them ultimately refuse that kind of assistance. If you watch the videotapes, when the vehicle arrives, Mr. Hamrick gets out of the car and he walks away from the front door. He's shuffling, he's in cuffs, he's not getting far, he's redirected, he's brought to the station. He's brought through a set of double doors that have been opened so that there are no difficulties. He comes through a second set of double doors. He is being escorted by Lieutenant McCadden and by the trooper supervisor, a sergeant on the state police. As they come through the second set of double doors, something happens. And that's key. I've cited materials which say that the people were there, that he was just being the pain in the backside or he was just being a problem. But there is a movement of his feet, which I would tell you constitutes a provocation by the person in custody for a reasonable response. Deputy McCadden takes, they pivot, takes him against the wall, and I will say that that's a reasonably violent exchange. What about slamming his face into the wall? I don't believe he was slammed and I don't believe his face. No, Judge, that's not true. What happens is his body is taken there, his head is away. Deputy McCadden, with an open hand, pushes his head against the wall. Mr. Hamrick is resisting. There's a little bounce. It's not a dribble of a basketball. It is an effort to control him. Did he strike him in the back of the head with a closed fist or a forearm at that point? Not at that point. He does hit him. You're saying that's not in evidence. No, no. I'm saying it's not against the wall, Judge. What happens is they move him over in front of the elevator. Mr. Hamrick throws his head back, and I'm going to demonstrate that sort of like this motion. Deputy McCadden believed it to be a head-butting effort. But he was handcuffed at that point. I agree. I agree. And there were other officers there who ultimately testified that there didn't see any reason for force to be used. Judge, I don't think that the officers saw that in the judgment here. The judgment's supposed to be Deputy Cadden's judgment about what's a reasonable force. He did strike him. I'm going to say he put his elbow up when he got the head. He wrapped him in the back of the head. I'm not going to say it was a punch. It wasn't an all-out effort to destroy the man. It was the kind of thing that I've done with my children, maybe not that hard, but when they speak back, I go for the face. Did they end up going to the hospital? Mr. Hamrick didn't go to the hospital, not as a result of this. But he had a gash above his eye. Which he had when he came in before there was any striking against the wall. Didn't the other five officers testify that he wasn't bleeding when he came into the station? Judge, I'll ask you to watch the videotape. That was in evidence, though, that he wasn't bleeding, but yet there was blood on the floor and the walls of the building and the elevator after this incident. That was the evidence. Judge, he'd been involved in an incident with a state trooper where the trooper rammed his head into parked vehicles twice to win the fight. So is it your position that the other five officers testified falsely? No, I think that most of the officers didn't really have a chance to see it. The two officers who were in the escort and the officer immediately behind him talk about the movement of the feet. I meant about the blood, actually. He said that he wasn't bloody when he came into the station. Judge, you can see him. He's pretty bloody as you come through the videotape. And they were all behind him. They were all behind him. It's a remarkable view. It's like I put a camera here where the light fixture is coming into the courtroom, and that's the camera. And what happens is all the other officers in the dark evening are out behind him. There's somewhat less light outside. Mr. Sheehan, you talked about this a moment ago, but what is it in your view that supported the actions of your client that Mr. Hamrick did? He walked away, right? So how does that support the actions of your client? Judge, it sets a tone for what we're going to do here. We need to be firm with the person in our custody. He needs to understand that we need to be firm with him. I didn't say unreasonable. I said firm. The case law is that a police officer has a right to be reasonable, and if he's made an error in judgment, the tie goes to the police officer. And so here what I'm telling you is as he comes through the videotape, he was sort of being a pain, as these other two officers described. He moves his feet, and I believe that's a provocation for Deputy Catton to take him to the wall and say that's not happening. You're going to pass. Did he grab him by his throat under the evidence? No, sir. No, ma'am. I'm sorry. He takes him. He's in the elevator, and he's in the corner. He pushes his head forward. I do not believe he ever grabs his throat. I would agree with you that that's a, and I would disagree with that statement in the government's brief. The problem is, and I know how difficult it is to say to you there's not enough evidence for conviction when my client's been in jail, and I've been doing this a while, but I really was surprised that this case was ever indicted. This is a very marginal situation if it's a situation at all. And I say that to you because as I argue about the lack of evidence for conviction, I also say to you that it signals that at best this is a close case, and that takes us into what we do with 404B evidence. We can all talk about a harmless error and how that works, but in my experience we have to be a little bit tighter as the cases get closer. And so as we do that and we look at these, this becomes a particular problem for me. I was not trial counsel in this case, but when trial counsel and I met, he talked to me and he said the real problem here is with the 404B evidence, and I said that's not going to be my lead because that's never a winner. But then I looked at it, and I looked at what the evidence is. And I have to say to you that I am shocked to find that the government thinks that it's 404B evidence, that my client, the brim of his hat, banged Mr. Settle in the nose. And that's the entirety of that difficulty, and that's being shown that my client had some intent, some motive, some mens rea requirement to continually abuse people in his custody. The deputy indicates that he thought Mr. Settle went to headbutt him, which would certainly respond to whatever the sheriff said. The statement in the brief from the Justice Department is it's uncorroborated, like it didn't mean anything. That's just not an appropriate way to deal with it. When a headbang, I get that, but this is not the kind of case that I think we're talking about. The Crowman incident is a complicated one. Mr. Hall, the alleged victim, doesn't describe a problem with the officer. He's not the complaining witness. It turns out it's the trooper's father, who's also a deputy, has some secret memo that's been left in a file when the Justice Department comes along to investigate. There's no punishment that was inflicted on Mr. Hamrick. Mr. Hamrick had brought on some issues for himself. He arrived at the police station in a bloody condition as a result of his confrontation with the state trooper, and that explains his injuries. And those injuries were ñ I don't think you're giving full credit to the record, though. You know, you said that he was bleeding when he came in, and nobody said that he wasn't bleeding, okay? But Officer Whitaker at 778, excuse me, and before, is saying that he wasn't bleeding when he came into the building, and then talked about the trail of blood after the incident, after seeing his head slammed into the wall. It seems to me that you're not being, with respect, that you're not being really faithful to the record. I'm trying to be fair to the evidence, Judge, and when I look at what I'm telling you is that there was a substantial confrontation. I do know the materials that are there. I wish there had been a more complete and thorough examination of that by trial counsel, but I will tell you that he comes in having just been in a major dust-up, and if he has clotted briefly and then he ends up in a stressful situation, my client, and he breaks out bleeding, that is not a suggestion that my client beat him to the point where he's exuding blood. We're talking drops of blood that are an issue in this particular case. Well, that's not what Whitaker said. Excuse me. Page 781. That's not what Whitaker said. After his head was slammed into the wall, yes, he was actively bleeding, and when you say actively bleeding, what do you mean? Blood dripping down onto the floor. There was a big gash cut above his left thigh now. Had you seen that prior to his head being slammed against the wall? No. I think you have to be faithful to the record, Mr. Sheehan, or your argument is not going to get anywhere. Judge, that's why I'm begging you to watch the videotapes, because they are an evidence, too, that's part of the record, and they don't present themselves the same way that the written record will do so here. It's unusual to do that. Did you say that the videotape rebuts that testimony? Yes, Your Honor. Did you say that he came in with, that he was bleeding? Yes. He has a mark here on his forehead. Well, that's different than saying he was bleeding. The precision of the bleeding, no, I can't give you that. The bottom of this is that's a good argument, I guess, in front of a jury, but the jury was entitled to credit that testimony and the testimony of the other officers who all said to a person that your client was out of control and acted patently unreasonably in imposing force on this particular individual. And I hear your question, and I know there's a disconnect between the testimony and the tape recordings, and that's why I come back to that. I have some difficulties with the 404B evidence. You know those. I'm close out of time. At the very beginning of your argument, you said that initially you thought that that was a non-starter, but then you looked at it carefully and thought otherwise. I suppose the problem initially for you is that the standard is very deferential. It's a rule of inclusion. And how can we, what's your best argument for suggesting? The key issue, Judge, is, I'm sorry. What's your best argument for saying that this was an abuse of discretion on the part of the district court? Two things. One of the parts of the four-part standard in Judge Thayer's case is that it has to be reliable. There's a significant disconnect between the testimony of the alleged victims and the other people talking. My client was running for sheriff against Sheriff Fletcher when he said there was a, he roughed up Mr. Settle. He doesn't see anything. He sends him to anger management counseling. My light's expired, if I may. If he, if he, he sends him to anger management counseling. He doesn't follow up on that. Deputy Cotton never goes. There's no notice to Deputy Cotton that anybody thinks that there's some regular idea of excessive use of force. Thank you. Okay. Mr. Wang, please. May it please the Court. Christopher Wang on behalf of the United States. I respectfully disagree with opposing counsel's characterization of this case as a close case. It's not a close case at all. The evidence viewed in light most favorable to government, which is the standard on appeal, indicates the government's evidence was more than sufficient to meet its burden of showing that the defendant willfully violated the victim's right to be free of excessive force as a pretrial detainee. Before the victim even arrived at the Hancock County Sheriff's Office, the defendant told another officer, this is our house, play by our rules. And then the opposing counsel mentioned the videotape. He says the videotape is the entire case. This is what the videotape showed. While the victim was handcuffed behind his back and surrounded by six law enforcement officers, the defendant threw the victim up against the wall, slammed his face into the wall, punched him in the back of the head, and grabbed him around the throat and forced his head into the corner of an elevator. Now, I think it's very important. I'd like to bring this Court's attention to the second use of force, which Judge Keenan identified, which is when the victim was up against the wall, his face and his body were up against the wall, the defendant took his head, brought it back, and slammed it into the wall. And the defendant failed to even mention this use of force in his brief. Why? It's because there is absolutely no plausible argument that there was any provocation on the part of the victim to induce this response by the defendant. Like I said, he was up against the wall and absolutely not resisting by any account of all the other law enforcement officers, yet had his face slammed into the wall. In concordance with this slamming of the victim's face into the wall, the defendant repeated his statement, this is our house, play by our rules. Then, when he forced the victim's head into the corner of the elevator, he yelled at the victim for being an idiot and fighting with his officers. Subsequently, in his use of force narrative report, the defendant omitted any mention of the slamming of the victim's head into the wall or the punch to the back of the head or the victim's injuries that occurred after his use of force. A reasonable jury can conclude that the defendant's use of force was excessive because it was objectively unreasonable under the circumstances as six officers testified and he acted willfully because his conduct, his statements, and his omissions in his narrative use of force report evinced a retaliatory intent or state of mind throughout the incident in consciousness of guilt. The government's direct evidence that the defendant willfully used excessive force against the victim was buttressed by evidence of prior incidents of the defendant's use of force. Any questions? Given what you said right before you got to the prior incidents, you're not making a harmless error argument with respect to the 404B issue? I mean, do you think there's enough to sustain the verdict in this case even without the prior bad acts? Absolutely, Your Honor. We believe there is no error in the admission of the prior acts evidence, but if the court concludes that it was error by the district court to do so, it was harmless beyond a reasonable doubt because of all this other direct evidence of the use of force against the victim in this case. Is the standard harmless beyond a reasonable doubt with regard to the erroneous admission of 404B evidence? Your Honor, I believe that the standard is, I mean, I don't. Is that a constitutional? I think the standard in the Fourth Circuit is did the erroneously admitted evidence substantially sway the judgment. I believe that's the standard, and in this case, applying that standard, we believe that it clearly did not substantially sway the judgment given the massive other evidence that the defendant willfully used excessive force just based on his actual conduct. You look at the videotape. I believe the videotape is in the court's possession. It's four uses of force within, say, a 30-second span. The statements that he made before the victim arrived at the Hancock County Sheriff's Office and during his uses of force against the victim and his omissions in his subsequent use of force narrative report. When you add all those together and you're, again, viewing the evidence in the light most favorable to the government, that was more than sufficient for a jury to find him guilty of Section 242. Yes, I suppose the problem with respect to the 404B evidence is that it literally just suggests, look, he did it before, he did it again. And that's exactly what you're not supposed to use 404B evidence for. Your Honor, we believe it does more than show criminal propensity. We believe there are sufficient similarities in terms of the time or closeness in terms of time, the pattern, and the state of mind between those incidents and the defendant's use of force against the victim to make them sufficiently. One of those occurred in the context of a suspect being accosted inside of a detention facility. Is that right? That's correct, Your Honor. That's correct, Your Honor. I'd like to direct this Court to the case of United States v. Boone. It's an Eighth Circuit case that states that the prior act's evidence do not need to be exact duplicates of the charged offense. I'd like to offer you a little bit of food for thought there. You have six officers' testimony in this case, direct evidence, and direct evidence of what the defendant said. Why would the government want to muck up its case by offering 404 evidence? Well, Your Honor, I think ex ante, we don't know how persuasive the jury is going to find the government's evidence. So, you know, the purpose of 404B is to sort of, even if you've got a lot of good evidence of the defendant's intent and state of mind, as we do in this case, is to even add some more evidence to shed light on what the defendant was thinking. Generally, defendants don't, when they're willfully using excessive force against victims, they generally don't announce that, okay, I have no legitimate law enforcement purposes for using force on you, but I'm going to punish you right now. Basically, they don't do that. So you have to be able to infer willfulness from the circumstances, and this evidence just sheds some more light on what the defendant might have been thinking at the time he used force against the victim. I think it was these incidents seemed to be less disturbing, in a sense, than the use of force against the victim in this particular case. So there's no real harm that the jury was overly swayed by, you know, severe criminal conduct in these prior incidents. Judge Diaz's point is, you know, they hear this evidence of these other events and they think, this might be a bad cop. This isn't just an isolated incident. And isn't that fundamentally what was at issue with this case? Was this officer acting willfully? And why prejudice the inquiry to that degree? We don't, Your Honor, we don't believe it prejudiced the inquiry. I think as long as you're going to have Rule 404B, I think these incidents spoke. The only reason you introduced the evidence is to prejudice the inquiry. The question is whether or not it unlawfully. Your Honor, we respectfully disagree that these incidents were introduced to prejudice the jury. I think if you had, if the government sought to introduce evidence that was wholly unrelated to the charged conduct in terms of the time and the pattern of behavior or the conduct, say, let's just use an example. If the defendant encountered a suspect who was a large-sized suspect, he had a fight with him, and then he pulled out his gun and shot him. And that was determined by perhaps his superiors to be an excessive use of force, which would be a very different sort of factual pattern than the incidents that we have in this particular case, which is that in both the Settle and Chrome Nightclub incidents, we have the defendant basically interacting with a member of the public, someone who is not in really any position to resist him. In both the Settle and Chrome Nightclub incidents, the other individual was an individual of much smaller stature than the defendant, and in both cases he used excessive force under the circumstances because he perceived that those individuals had disrespected him. And I think that sheds light on what happened in this particular case here, because you have the defendant arguing that his use of force was reasonable under the circumstances because the victim was pulling away in one instance and maybe had pulled his head back as if to headbutt the defendant. And these prior incidents do shed light that, no, what happened was not that these were reasonable responses to provocations by the victim, but they were responses to what the defendant perceived as disrespect by an individual. And for those reasons, we discussed in our brief how these incidents satisfied the well-settled queen test, which was for admitting the evidence was relevant, necessary, reliable, and the probative value was not substantially outweighed. How was it necessary? I understand necessary doesn't really mean necessary under the case law, but even under the case law, how was it necessary? Necessary. When you had this brigade of witnesses, police officers who witnessed the conduct, why did you need it at all? I mean, what was the point of it? The point of it is, I think, to just shed more light on what his state of mind is. I think the United States v. Moore addressed this very argument in United States v. Moore. The defendant argued that there was a lot of direct evidence and the government didn't need to bring in this prior act evidence of a similar incident. And this court, in an opinion written by Judge Motz, rejected that argument because it said that the defendant in that particular case put her, you know, disputed intent, disputed that she had this specific intent of willfully depriving the individual of excessive force. And the government has a significant burden under Section 242 of proving beyond a reasonable doubt that the defendant willfully deprived the victim of his right to be free of excessive force. I'm sorry. Judge Harris. I want to make sure I understand. So what you're saying is that this evidence wasn't, I'm trying to, I'm going back to your kind of hypothetical about the shooting might not have come in. So the idea is that this is not, it can't come in, you can't bring in prior bad acts that show he's a bad cop. That's right, Your Honor. What you can bring in is these prior incidents that show something much more specific about how his mind works, which is that if he perceives a disrespecting of police authority, he then intends to punish. That's right, Your Honor. Okay. Yeah, I think that, I mean, there's a very fine line. I would admit there's a fine line in 404B evidence between evidence that is admissible to show a, something that is the rule allows, such as state of mind, and evidence that's just brought in to show, as Judge Diaz put it, that the defendant's a bad guy. I mean, there's a very thin line there. But I think that this evidence here is clearly on the permissible side of the line. You have the decision in Brown, in the Seventh Circuit, right, which is kind of on all fours on this? Yes, it's very similar, Your Honor. Are you also trying to make an argument that the evidence is coming in to negate sort of an accident or a mistake kind of defense that, to the extent he's saying, look, I didn't know anyone would consider this excessive, that in both of those prior incidents someone told him, hey, this is excessive? That's right, Your Honor. I think in the Settle incident, you have Sheriff Fletcher pulling, you know, I think opposing counsel mischaracterized the Settle incident a little bit. It's not just the defendant hitting Mr. Settle on his nose with the brim of his hat. It's also the subsequent wrestling of Mr. Settle to the ground, a much smaller, much older man. And you have Sheriff Fletcher coming in and pulling the defendant off of Mr. Settle and saying that he looked like his face was in a rage, subsequently meeting with the defendant and saying, look, you might want to think about getting anger management counseling. How is that relevant? That put the defendant on notice that his conduct, his interactions with private citizens was unacceptable. And given that the Settle incident occurred seven months prior to the charged conduct in this case, we think that's extremely relevant because he knew that he had a problem with basically using excessive force in his interaction with private individuals and he just needed to hold off on that. So that sort of went to his state of mind. So what he knew that he should have and should have not been doing when he was interacting with private individuals. In the nightclub incident, if I'm remembering right, one of his colleagues says to him, like, you've gone too far here. Does anyone tell, I know one of his colleagues reports it up, but does anyone tell him that one was too far? I don't know if the record indicated that anybody told, I don't believe it did. I think that Deputy Hodor testified that he helped to handcuff Mr. Hall so as to stop the defendant from beating him further. I don't think that there's any evidence in the record that Deputy Hodor ever said, listen, you've gone too far. I would, with regard to the nightclub incident, I would disagree with opposing counsel that this testimony is not reliable simply because there were some slight discrepancies between the testimony of Mr. Hall and Deputy Hodor regarding the number of punches that the defendant threw. We discussed this in a brief that it's not the exact number of details that's relevant, that goes to reliability, that's basically they both testified to the punch in the van and the punch on the ground. And that was, I think, by any measure excessive, excessive force against Mr. Hall in that particular instance. Your Honor, I think I'd like to move briefly, unless the court has more questions on the willfulness and Rule 404B issues, I'd like to move to the instruction because the opposing counsel mentioned that very briefly at the top of his arguments. The review is for plain error because the defendant submitted an alternative instruction but did not object to the instruction in the verdict form that the district court actually gave to the jury. The district court did not commit plain error using this two-step jury instruction and the special verdict form to instruct the jury on the elements of the Section 242 offense. The defendant's argument otherwise simply elevates form over substance. The jury was required to find the defendant guilty of every element of the offense beyond a reasonable doubt, including injury, and the jury simply could have convicted the defendant of a misdemeanor if it found the defendant did not cause bodily injury. And this court, in the Odi Ozar case that we've cited, has previously approved a verdict form that asked the jury to make special findings after it found the defendant guilty, which it did in this particular case. I'd like to also briefly, I've got a few more minutes, so I'd like to briefly discuss restitution. The defendant's contention that he should not have to pay the victim's medical expenses because he did not cause the victim's injuries is without merit. I think Judge Keenan and Judge Diaz went over this a bit in the opposing counsel's opening argument, which is that there's record testimony is replete that Cowden's use of force against Hamrick caused cuts, blood, active bleeding from Hamrick after the use of force. And I don't think you can look at a grainy videotape and indicate that that contradicts the testimony of the officers who had a very close view of what the victim looked like after the uses of force. And the testimony of these other officers and the jury's finding of bodily injury triggered the MVRA's requirement of restitution and were sufficient to establish that the CT scan and the emergency room care were necessary services for the victim's head injuries. Because it is impractical to apportion a cost for which the defendant is responsible, the district court acted well within its discretion in ordering restitution for the full amount of these services. It's simply enough that the defendant cause the injuries that require the medical services at issue. In conclusion, the defendant's arguments failed to call into question the validity of his conviction and sentence. Accordingly, the United States respectfully requests this court affirm the judgment of the district court. I'm free to answer any more questions if the court has any. Otherwise, I'll just see the rest of my time. Thank you, Mr. Wayne. Thank you. Mr. Shand? I want to come back to the issue of the blood. I want to talk about the incident involving the trooper out at the snow at the arrest point. The trooper there indicates there was a substantial amount of blood at that scene, a transmittal distance from the northern Hancock County area to the center of Hancock County. It's small. It's probably about 20 minutes. He probably clotted following that particular incident. The blood, if you look at the physical evidence in the elevator and on the floor, is drops. It is not a gusher. It's not ñ I take blood thinners these days. I bleed this much when I scratch myself. I have a real difficulty with how that's worked. Counsel talks to you about the other incidents as being the same, but the government gives the reason that they wanted to offer this evidence, one of the litany of reasons, it's a state of mind. But then they want to start telling you it's about disrespect or it's about his autonomic reaction to some kind of stressors. It is not ñ that's not how 404B evidence works. I looked at Judge Thayer's case, Sanders, pretty carefully. It's the case where there's an inmate in jail who has a shiv, and he's on trial for having a shiv, and the prior case is that he had a shiv before. And ultimately this court said, no, that's not significant. It wasn't an issue in the case. Nancy, did you take a look at that Brown case in the Seventh Circuit? I can't recall it enough to comment on it. This is what would remind you. It's exactly the same as this case, where an officer is on trial, same charges, prior bad acts come in on the theory, and the Seventh Circuit affirms, on the theory that they are ñ they don't go to justice officer as a bad guy. They don't even go just to he's prone to use violence with suspects. They go to this very specific intent to punish people who show disrespect for police officers. So I guess, I mean, we can always just say we disagree with the Seventh Circuit, but I was just wondering whether you had ñ No, I can't say that I have studied it. But I will tell you that when I looked at the settle incident, and I was very faithful because I knew that if I over-argued it, I'd be in trouble here. The settle incident, he says he's a bang with the brim of his hat, and that testimony comes from Sutton. When you say that, it starts to make me think, well, then who cares if it came in? So what if the jury heard that he banged someone with the brim of his hat? Well, it then leads to the sheriff, who didn't see any confrontation, who saw my client yelling at him and being over him, and we get into this, all this stuff about rage. Does the analysis of the 404B issue, does it vary at all depending on whether the defendant testified in the case? I don't think so, Judge. Why not? Well, what you want to do is ñ the question on cross-examination is his truthfulness and veracity, maybe other things about him. But I don't think you get into the ñ That's fine. Oh, that's fine. But I don't find any intent in the settle incident or the Hall incident. It's just not there. You would not have cross-examined him about that either way. It's just those incidents are so far removed, it's really hard to describe that in a way that I'm apparently not doing. But if I can convince you to look at the videotape, you'll have a very different view of this case. Thank you, Your Honors. Thank you. We'll come down to Greek Council and then we'll proceed to our next case.
judges: Barbara Milano Keenan, Albert Diaz, Pamela A. Harris